**WO**

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Penny Duvall, | No. CV-18-00610-TUC-MSD |
| Plaintiff, | **ORDER** |
| v. | |
| Commissioner of Social Security Administration, | |
| Defendant. | |

Plaintiff Penny Duvall filed this action pursuant to 42 U.S.C. § 405(g) seeking judicial review of a final decision by the Commissioner of Social Security. (Doc. 1.) Before the Court are Duvall's opening brief, the Commissioner's response brief, and Duvall's reply brief. (Docs. 19, 20, 21.) For the following reasons, the Commissioner's decision will be affirmed.

## Background

### I. Procedural History

Duvall applied for disability insurance benefits on August 3, 2015, claiming a disability onset date of January 1, 2010. **AR 60.**[1] Her application was denied on November 13, 2015, and again on reconsideration on March 2, 2016. **AR 87, 92.** On March 9, 2016, Duvall requested a hearing before an administrative law judge ("ALJ"). **AR 95.** At the hearing, held on August 9, 2017, Duvall testified about her medical conditions and past work, and a Vocational Expert ("VE") testified about which jobs a hypothetical person

---
[1] "**AR**" refers to the Certified Administrative Record.

with Duvall's characteristics can perform. **AR 36–58.** On December 7, 2017, the ALJ issued a written decision finding Duvall not disabled and denying benefits. **AR 15–30.** On November 13, 2018, the Appeals Council denied review. **AR 1–3.** Duvall now seeks judicial review of the ALJ's decision denying benefits. (Doc. 1.)

## II. Factual Background

Duvall was born with Turner syndrome, a chromosomal condition that affects only women. *See* **AR 378.** Duvall has several conditions associated with Turner syndrome, including heart defects, short stature, obesity, and deficient interpersonal skills. **AR 24, 378, 380.** Duvall has congenital heart disease, including coarctation (narrowing) and dilation of the aorta and a bicuspid aortic valve. **AR 339.** She had two heart-related surgeries as a child: one in 1983 to insert a synthetic conduit between the ascending and descending aortas, and a pericardiectomy in 1985 to address constrictive pericarditis. **AR 315.** She underwent cardiac catheterization in 2012. **AR 529–32.**

Duvall has a bachelor's degree. **AR 185.** She was a substitute middle-school teacher from 2000 to 2005, and a fulltime elementary-school teacher from 2005 to 2009. **AR 186.** According to Duvall, she was let go from her teaching positions due to "interpersonal relations with co-workers, management in particular." **AR 185.**

Dr. Daniela Lax is Duvall's treating cardiologist. On March 18, 2013, Dr. Lax wrote an assessment letter on behalf of Duvall. **AR 380**. On April 18, 2016, after Duvall's date last insured, Dr. Lax completed a Cardiac Impairment Questionnaire. **AR 514–519.** The substance of Dr. Lax's reports, as well as the ALJ's treatment of them, are discussed below as relevant.

## III. Hearing

At the hearing before the ALJ, Duvall testified that she has Turner syndrome and suffers from many of the effects of that condition, including congenital heart disease, short stature (she is five feet tall), obesity (she weighed 180 pounds on the date of the hearing), and difficulty functioning in social situations. **AR 40–41, 46.** According to Duvall, prior to her date last insured, she was able to dress and bathe herself, assist her mother with

household chores, go grocery shopping, do laundry, mow the lawn, go swimming for 20 to 30 minutes at a time, and drive a car. **AR 41–44.** However, she testified that she often requires two to three days of recovery after doing some of these tasks, and two to three times per month she will feel "sharp pains" while doing them. **AR 46, 49–50.**

Duvall also testified that she has a college degree and used to be a teacher. **AR 40.** When asked how she was able to achieve this with Turner syndrome, she explained that the symptoms of Turner syndrome were often ignored or incorrectly characterized while she was growing up (e.g., she was called a "strong-willed child"), and that without her parents pushing her to go to college and get a job, she probably would not have done so. **AR 46–47.** She testified that her lack of interpersonal skills caused her to be fired from three teaching jobs for being "unprofessional" and not "follow[ing] instructions." **AR 47–48.** As an example, she stated that she was reprimanded for being "assertive and aggressive towards the students," including taking a deck of cards from a student. **AR 51–53.**[2]

The VE testified that Duvall's teaching work is within the light exertion range. **AR 56.** The ALJ asked the VE about a hypothetical claimant with Duvall's age, education, and work history who can sit, stand, or walk for six hours per eight-hour workday, occasionally lift and carry 20 pounds, frequently lift and carry 10 pounds, frequently climb, balance, stoop, kneel, crouch, and crawl, and occasionally interact with coworkers, supervisors, and the public. **AR 56.** The VE testified that the hypothetical claimant could not perform Duvall's past teaching job. **AR 56.** According to the VE, however, the hypothetical claimant could perform other jobs in the national economy, including marking clerk, hand packager, and production helper. **AR 56.** The VE confirmed that her testimony was consistent with the Dictionary of Occupational Titles. **AR 57.**

### IV. ALJ Decision

The ALJ followed the five-step sequential evaluation process for determining whether an individual is disabled. **AR 19–30.** At step one, the ALJ found that Duvall was

---

[2] Duvall testified that she also attempted, unsuccessfully, to do food-service and telemarketing work. **AR 53–54.** According to Duvall, she was not able to properly interact with customers or follow instructions, so she resigned before she could be fired. **AR 53–54.**

not engaged in "substantial gainful activity." **AR 20.** At step two, the ALJ found that Duvall has three "severe" impairments: Turner syndrome, congenital heart disease, and obesity. **AR 20.** The ALJ found that Duvall's lack of interpersonal skills is a "non-severe" mental impairment. **AR 20–23.** At step three, the ALJ found that Duvall does not have an impairment or combination of impairments that meets or medically equals the severity of one of the impairments listed in 20 C.F.R. Part 404, Subpart P, Appendix 1. **AR 23.**

Between steps three and four, the ALJ found that Duvall has the residual functional capacity ("RFC") to sit, stand, or walk for six hours per eight-hour workday, occasionally lift or carry 20 pounds, frequently lift or carry 10 pounds, frequently climb, balance, stoop, kneel, crouch, or crawl, and occasionally interact with coworkers, supervisors, and the public. **AR 24.** In determining Duvall's RFC, the ALJ found that Duvall's statements about her symptoms were "not entirely consistent with the medical evidence and other evidence in the record." **AR 25.** The ALJ gave "controlling weight" to Dr. Lax's assessment of Duvall in 2013, which noted only that Duvall requires ongoing monitoring due to Turner syndrome, not that Duvall has functional limitations. **AR 26.** The ALJ gave "limited weight" to opinions rendered by Dr. Lax in 2016, including that Duvall cannot lift or carry more than five pounds, because they were rendered after Duvall's date last insured and lack evidentiary support. **AR 27.** The ALJ gave "substantial weight" to the opinions of the agency physicians because "they reviewed available information," and "[s]ubsequent treatment records have not documented any significant change in the claimant's condition through the date last insured." **AR 27.**

At step four, the ALJ found that Duvall cannot perform her past relevant work, either as actually performed or as generally performed in the national economy. **AR 28.** At step five, the ALJ noted that Duvall's vocational profile under 20 C.F.R. Part 404, Subpart P, Appendix 2 supports a finding that she is not disabled. **AR 28–29.** The ALJ, considering Duvall's age, education, work experience, and RFC, then found that Duvall could have performed jobs other than teaching prior to her date last insured, and, therefore, that she is not disabled. **AR 28–30.**

**Standard of Review**

A person is "disabled" within the meaning of the Social Security Act if she is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). "When considering a claim for disability benefits, the Social Security Administration is required to conduct a now-familiar five-step sequential evaluation process to determine whether a claimant is disabled and eligible for benefits." *Shaibi v. Berryhill*, 883 F.3d 1102, 1106 (9th Cir. 2017). The claimant bears the burden of proof at steps one through four; the Commissioner bears the burden at step five. *Barnes v. Berryhill*, 895 F.3d 702, 703 n.3 (9th Cir. 2018) (citing *Tackett v. Apfel*, 180 F.3d 1094, 1098 (9th Cir. 1999)).

At the first step, the ALJ determines whether the claimant is engaged in "substantial gainful activity." 20 C.F.R. § 404.1520(a)(4)(i). If yes, the ALJ will find the claimant not disabled. *Id.* At the second step, the ALJ considers whether the claimant has a "severe" physical or mental impairment, or a combination of impairments that is "severe," that has lasted at least one year. *Id.* §§ 404.1520(a)(4)(ii), 404.1509. If not, the ALJ will find the claimant not disabled. *Id.* § 404.1520(a)(4)(ii). At the third step, the ALJ considers whether the claimant's impairments meet or equal one of the medical conditions listed in 20 C.F.R. Part 404, Subpart P, Appendix 1. *Id.* § 404.1520(a)(4)(iii). If yes, the ALJ will find the claimant disabled. *Id.*

If the ALJ does not find the claimant disabled at the third step, before proceeding to the fourth step, the ALJ will determine the claimant's RFC—i.e., what the claimant can still do despite her limitations. *See Trevizo v. Berryhill*, 871 F.3d 664, 674 (9th Cir. 2017); 20 C.F.R. § 404.1545(a)(1). At the fourth step, the ALJ considers whether the claimant has the RFC to perform her "past relevant work." 20 C.F.R. § 404.1520(a)(4)(iv). If yes, the ALJ will find the claimant not disabled. *Id.* At the fifth step, the ALJ considers the claimant's RFC, age, education, and work experience and determines whether the claimant

"can make an adjustment to other work." *Id.* § 404.1520(a)(4)(v). If yes, the ALJ will find the claimant not disabled; if not, the ALJ will find the claimant disabled. *Id.*

The ALJ's decision to deny disability benefits is subject to harmless-error review, *Buck v. Berryhill*, 869 F.3d 1040, 1048 (9th Cir. 2017) (citing *Molina v. Astrue*, 674 F.3d 1104, 1111 (9th Cir. 2012)) and must be affirmed "unless it is not supported by substantial evidence or is based on a legal error," *Wellington v. Berryhill*, 878 F.3d 867, 871 (9th Cir. 2017) (citing *Berry v. Astrue*, 622 F.3d 1228, 1231 (9th Cir. 2010)). "Substantial evidence 'is more than a mere scintilla,' but less than a preponderance." *Luther v. Berryhill*, 891 F.3d 872, 875 (9th Cir. 2018) (quoting *Saelee v. Chater*, 94 F.3d 520, 522 (9th Cir. 1996) (per curiam)). "A reviewing court may only consider the reasons provided by the ALJ in the disability determination and 'may not affirm the ALJ on a ground upon which he did not rely.'" *Id.* (quoting *Garrison v. Colvin*, 759 F.3d 995, 1010 (9th Cir. 2014)).

## Discussion

### I. Evaluation of Symptom Testimony

Duvall testified that it takes her a long time to do household chores because she suffers from fatigue and sharp physical pain. **AR 24, 45–46, 49–50.** She also testified that she needs two to three days to recover after doing household chores. **AR 24, 42–43.** The ALJ provided two reasons for discounting this symptom testimony. **AR 24–25.** Duvall asserts neither reason is legally sufficient. The Commissioner responds that the ALJ's decision is rational and supported by substantial evidence. For the following reasons, substantial evidence supports the ALJ's rejection of Duvall's symptom testimony.[3]

### A. Legal Principles

There is a two-step analysis for determining whether to credit a claimant's symptom testimony. *Trevizo*, 871 F.3d at 678. "First, the ALJ must determine whether the claimant has presented objective medical evidence of an underlying impairment 'which could

---

[3] Duvall also testified that she has a lack of interpersonal skills, which resulted in her quitting or being terminated from every job she has had. **AR 46–48, 51–54.** The ALJ apparently believed this symptom testimony, because the RFC limits her interaction with other people. *See* **AR 24.** Duvall does not challenge the ALJ's adoption of this limitation.

reasonably be expected to produce the pain or other symptoms alleged.'" *Garrison*, 759 F.3d at 1014 (quoting *Lingenfelter v. Astrue*, 504 F.3d 1028, 1035–36 (9th Cir. 2007)). The claimant need not present evidence of the symptom itself (e.g., pain), or of its severity. *Id.* (quoting *Smolen v. Chater*, 80 F.3d 1273, 1282 (9th Cir. 1996)). Second, if "there is no evidence of malingering, 'the ALJ can reject the claimant's testimony about the severity of her symptoms only by offering specific, clear and convincing reasons for doing so.'" *Id.* at 1014–15 (quoting *Smolen*, 80 F.3d at 1281).

### B. Analysis

Here, the ALJ concluded that Duvall's medical impairments could reasonably be expected to cause her alleged symptoms. **AR 25.** The ALJ made no finding that Duvall is malingering. *See* **AR 25.** Therefore, the ALJ could reject Duvall's symptom testimony only for specific, clear, and convincing reasons. *See Garrison*, 759 F.3d at 1014–15. Here, the ALJ provided two reasons.

The ALJ's first reason is that "cardiology reports during the period at issue document that the claimant's condition was stable" and that "[s]he was without chest pain or syncope." **AR 24–25.** Duvall argues this is not a valid reason for rejecting her testimony, because "stable" means only that her conditions have not changed, not that she is healthy. Pointing to treatment records stating that she has a dilated descending aorta, she says that her condition is "serious and chronic, and there is little else her physicians can do for her," making her disabled condition "stable." The Commissioner criticizes Duvall's argument for starting from the premise that she is disabled, when it is her burden to establish disability. Furthermore, the Commissioner says, the ALJ's analysis and conclusion are reasonable.

Substantial evidence supports the ALJ's first reason. To begin, Duvall's argument ignores and/or misconstrues the ALJ's analysis and the medical evidence. Duvall is correct that a disabling condition can be "stable." This does not help Duvall, though, because Dr. Lax does not state in the relied-upon treatment records that Duvall's dilated descending aorta is disabling. *See* **AR 380, 535.** Furthermore, as discussed below, Dr. Lax's treatment

records during the disability period consistently indicate that Duvall was doing well from a cardiological standpoint and thus "stable" in a positive way. Duvall does not address these reports, or the ALJ's thorough review of them. Duvall's argument is detached from the evidence and the ALJ's analysis and is therefore unpersuasive.

Moreover, the ALJ's analysis withstands scrutiny. The ALJ identified Duvall's statements about the intensity, persistence, and limiting effects of her symptoms, specifically that she requires multiple days of recovery after performing household chores and that she feels fatigue and physical pain while performing them. **AR 24.** The ALJ then concluded that such statements are "inconsistent" with "cardiology reports" stating that she was "stable" and "without chest pain" during the disability period. **AR 24–25.**

The ALJ then described those reports, beginning with a report authored by Dr. Lax in late 2010, the alleged year of disability onset. **AR 25, 277.** In that report, Dr. Lax noted that Duvall "had done well since her last visit," had a "normal" energy level, "had not been sick," had "no history of chest pain, syncope or palpitations," and "was clinically stable." **AR 25, 277.** The ALJ found that reports such as these "fail to support a finding of disabling functional loss" and that "[s]ubsequent reports do not show deterioration in the claimant's condition." **AR 25.** In other words, the ALJ found that Duvall was not functionally limited at the beginning of the disability period, and that she maintained her good condition up through the date last insured.

The subsequent treatment reports support this conclusion. In describing them, the ALJ excerpted notes indicating that Duvall was doing well overall and stable from a cardiac standpoint (though she requires monitoring). **AR 25–26.** Specifically, the ALJ discussed a May 2012 report in which Dr. Lax noted that an MRI showed Duvall's cardiac condition was largely unchanged since her last MRI in 2006, that there was no history of chest pain, syncope, or palpitations, and that she was swimming, training for a 1000-step activity, and volunteering, **AR 254**; a January 2013 report in which Dr. Lax noted that Duvall had done reasonably well overall and had no concerns or complaints, that she was swimming four times per week and dancing two times per month, and that she had no reports of chest pain,

syncope, or palpitations, **AR 252**; an October 2014 report in which Dr. Lax noted that Duvall had no change in energy level, **AR 504**; and an October 2015 report (one year after the date last insured) in which Dr. Lax noted that Duvall had no change in energy level and was stable from a cardiac standpoint, **AR 508**. *See* **AR 25–26.** These records do not indicate that Duvall had any disabling symptoms or impairments and thus are substantial evidence supporting the ALJ's findings.

Duvall argues in her reply brief that, as time passed, Dr. Lax's assessment of Duvall's cardiac condition became more "equivocal." As an example, she points to a May 2012 report stating that her hypertension "could be under better control" and that she has "mild stenosis in conduit." **AR 254.** As noted above, though, the same treatment report also states that Duvall's cardiac condition had not changed in the preceding six years, and that Duvall was physically active and without chest pain. **AR 254.** "Where evidence is susceptible to more than one rational interpretation, it is the ALJ's conclusion that must be upheld." *Burch v. Barnhart*, 400 F.3d 676, 679 (9th Cir. 2005). Duvall is merely pressing her own rational interpretation of the evidence. Because the ALJ's interpretation is also rational, Duvall's argument must be rejected.

The ALJ's second reason for discounting Duvall's symptom testimony is that Duvall's "reported activities . . . are also inconsistent with disabling functional limitations." **AR 25.** Duvall says that none of the activities identified by the ALJ—swimming, yoga, dancing, step-climbing (for a brief period, until shortness of breath caused her to quit), caregiving for her mother, and volunteering as a court-appointed child advocate—are inconsistent with her claimed limitations. The Commissioner responds that Duvall's activities are indeed inconsistent.

Although Duvall's activities probably belie her symptom testimony, substantial evidence does not support the ALJ's conclusion. An ALJ may rely upon a claimant's daily activities to reject the claimant's symptom testimony if the activities either contradict the symptom testimony or involve skills that could be transferred to the workplace. *Orn v. Astrue*, 495 F.3d 625, 639 (9th Cir. 2007). The Ninth Circuit has cautioned against placing

undue significance on a claimant's daily activities, since "disability claimants should not be penalized for attempting to lead normal lives in the face of their limitations[.]" *Garrison*, 759 F.3d at 1016 (quoting *Reddick v. Chater*, 157 F.3d 715, 722 (9th Cir. 1998)).

Here, Duvall's daily activities likely do not translate into work skills. They probably are, however, inconsistent with her symptom testimony. She testified that it takes her a long time to do household chores because she gets fatigued and feels pain, and she requires two to three days afterward to recover. These symptoms do not harmonize with her activities, including, for example, swimming for an hour several times per week. *See* **AR 252.** Swimming may be a low-impact activity, but it requires more exertion than household chores like sweeping or mopping, so it makes little sense that household chores would cause sharp pain and fatigue necessitating days of recovery, but frequent swimming would not have that effect.

The problem is the ALJ did not say this, nor is it clearly implied in the decision. The ALJ merely concluded that Duvall's activities "are inconsistent with disabling functional limitations," without providing *reasons* why that is. **AR 25.** "Long-standing principles of administrative law require [federal courts] to review the ALJ's decision based on the reasoning and factual findings offered by the ALJ—not *post hoc* rationalizations that attempt to intuit what the adjudicator may have been thinking." *Bray v. Comm'r of Soc. Sec. Admin.*, 554 F.3d 1219, 1225 (9th Cir. 2009). It would be improper to flesh out the ALJ's second reason, however easy that may be. For this reason, substantial evidence does not support the ALJ's second reason.

The ALJ provided a specific, clear and convincing reason for rejecting Duvall's symptom testimony. Thus, the ALJ's conclusion is supported by substantial evidence.

**II. Evaluation of Medical-Opinion Evidence**

Duvall argues that the ALJ erred in giving "limited weight" to Dr. Lax's opinion that Duvall has a severe lifting and carrying restriction. The Commissioner responds that the ALJ appropriately considered all physicians' opinions and correctly rejected the lifting and carrying restriction as unsupported by objective medical evidence. For the following

reasons, substantial evidence supports the ALJ's conclusion.

### A. Background

Dr. Lax wrote an assessment letter on behalf of Duvall in March 2013, confirming Duvall's diagnosis of Turner syndrome and related surgical history. **AR 380.** The letter states that Duvall has "significant residual obstruction across the repair area," that she suffers from hypertension, that she "requires ongoing follow-up and periodic testing such as echocardiograms, MRI's and cardiac catheterizations," and that "[i]t is possible that she may require surgery in the future." **AR 380.** In April 2016 (one-and-a-half years after the date last insured), Dr. Lax completed a Cardiac Impairment Questionnaire on behalf of Duvall, again noting her cardiological diagnoses. **AR 514–19.** Dr. Lax declined to comment on how long Duvall can sit or stand in an eight-hour workday, how often Duvall would experience pain, fatigue, or other symptoms in an eight-hour workday, or how often Duvall would need breaks or miss work. **AR 516–18.** Dr. Lax did check two boxes indicating that Duvall is limited to occasionally lifting or carrying a maximum of five pounds—a restriction that renders her incapable of the full range of sedentary work, the least strenuous category of work. **AR 516.**

The ALJ gave controlling weight to Dr. Lax's 2013 assessment not because of what it says, but because of what it does not say: "This assessment does not suggest any functional limitations but documents the claimant's need for ongoing treatment." **AR 26.** The ALJ gave limited weight to Dr. Lax's 2016 checkbox opinion, explaining that "it was made over a year after the claimant's date last insured for benefits, which renders i[t] less persuasive for the period at issue." **AR 27.** As for the proposed five-pound lifting and carrying restriction, the ALJ explained that "this restriction is not supported by objective evidence." **AR 27.** The ALJ gave substantial weight to the non-examining agency physicians, both of whom opined that Duvall can frequently lift and carry up to 10 pounds. **AR 27–28, 69, 83.**

### B. Legal Principles

Dr. Lax's opinion that Duvall is limited to occasional lifting or carrying of five

- 11 -

pounds is contradicted by the opinions of Dr. Christopher Maloney and Dr. Bert Spetzler, both of whom opined that Duvall can frequently lift or carry up to 10 pounds. **AR 69, 83, 516.** As such, Dr. Lax's opinion may be rejected only for "specific and legitimate reasons that are supported by substantial evidence." *Trevizo*, 871 F.3d at 675 (quoting *Ryan v. Comm'r of Soc. Sec.*, 528 F.3d 1194, 1198 (9th Cir. 2008)). "The ALJ can meet this burden by setting out a detailed and thorough summary of the facts and conflicting clinical evidence, stating his interpretation thereof, and making findings." *Id.* (quoting *Magallanes v. Bowen*, 881 F.2d 747, 751 (9th Cir. 1989)). However, "an ALJ may discredit treating physicians' opinions that are conclusory, brief, and unsupported by the record as a whole or by objective medical findings." *Burrell*, 775 F.3d at 1140 (emphasis omitted) (quoting *Batson v. Comm'r of Soc. Sec. Admin.*, 359 F.3d 1190, 1195 (9th Cir. 2004)).

Dr. Lax's checkbox opinion was rendered 18 months after Duvall's date last insured. "[M]edical evaluations made after the expiration of a claimant's insured status are relevant to an evaluation of the pre-expiration condition." *Smith v. Bowen*, 849 F.2d 1222, 1225 (9th Cir. 1988). However, the ALJ may properly consider the remoteness of an after-the-fact opinion when determining its weight. *See Lombardo v. Schweiker*, 749 F.2d 565, 567 (9th Cir. 1984) (per curiam) (holding it was appropriate for the ALJ to reject a medical opinion rendered one-and-a-half years after the date last insured).

**C. Analysis**

Duvall offers several arguments why the ALJ erred. First, she says, it does not matter that Dr. Lax rendered her checkbox opinion after the date last insured, since that opinion was based upon objective evidence gathered before or contemporaneous with the date last insured. She alternatively argues that because the ALJ found her condition to be "stable," Dr. Lax's opinion logically applies to all periods in which her condition was stable, including before the date last insured. Second, she says, Dr. Lax's lifting and carrying restriction *is* supported by objective evidence. She points out that the imaging reports attached to Dr. Lax's checkbox opinion show increasing dilation of the conduit between the ascending and descending aorta, a circumstance that places her at an increased

risk of rupture. Third, and relatedly, she asserts that it was error to rely on the non-examining physicians' opinions, since their opinions were based upon limited imaging reports, not her most recent imaging. Fourth, she contends it does not necessarily follow that because the March 2013 assessment contains no functional limitations, that she had no limitations at that time. Furthermore, she asserts it was error to give the March 2013 assessment, which contains no opinions, controlling weight over the checkbox opinion from the same doctor regarding the same condition. The Commissioner responds that the ALJ's analysis is reasonable.

Substantial evidence supports the ALJ's evaluation of the medical-opinion evidence. Duvall's argument ignores the full context of the ALJ's decision. As explained above, the ALJ thoroughly reviewed Duvall's medical records and found that such records "fail to support a finding of disabling functional loss." **AR 25–26.** The ALJ also found that Duvall's condition remained stable throughout the disability period and did not deteriorate. **AR 25.** A review of the cited records shows that the ALJ did not cherry-pick treatment notes in an attempt to mischaracterize Duvall's condition. The records indeed indicate that Duvall was doing well from a cardiac standpoint; they *do not* indicate that she was functionally limited. Therefore, the ALJ's findings are supported by substantial evidence.

With the foregoing in mind, the ALJ's analysis of the opinion evidence is also supported by substantial evidence, and plainly so. Duvall first challenges the ALJ's analysis of Dr. Lax's 2013 assessment letter. She argues it was error to conclude that she has no functional limitations merely because the letter mentions no such limitations. But, as explained above, the ALJ rationally concluded that Duvall's cardiology records "fail to support a finding of disabling functional loss." It was thus rational (and consistent) to infer from Dr. Lax's failure to "suggest any functional limitations" during the disability period that Duvall had no such limitations. **AR 26.** Duvall's argument that the foregoing conclusion does not *necessarily* follow is also a rational view of the evidence. However, when both the claimant's and ALJ's interpretations are rational, it is the ALJ's that governs.

*See Burch*, 400 F.3d at 679.

For much the same reason, substantial evidence also supports the ALJ's rejection of the five-pound lifting and carrying restriction as "not supported by objective evidence." **AR 27.** Based upon the ALJ's thorough review of Duvall's medical records and consequent findings that Duvall was stable and not functionally limited, it was rational for the ALJ to conclude that the five-pound lifting and carrying restriction is not supported by objective evidence. An "incongruity" between a physician's opinion and the claimant's medical records, like the one identified here by the ALJ, is a specific and legitimate reason for rejecting the opinion. *See Tommasetti v. Astrue*, 533 F.3d 1035, 1041 (9th Cir. 2008) (holding ALJ provided a specific and legitimate reason by explaining that the claimant's "medical records d[id] not provide support for the limitations set out in the Questionnaire").

Duvall argues that the five-pound lifting and carrying restriction *is* supported by objective evidence, namely the three reports attached to the questionnaire. She is merely urging the Court to adopt her interpretation of the evidence, however, without regard for whether the ALJ's interpretation is rational. As explained above, it is. *See Burch*, 400 F.3d at 679. She also argues that the non-examining physicians' opinions alone do not constitute substantial evidence for rejecting Dr. Lax's opinion. *See Tonapetyan v. Halter*, 242 F.3d 1144, 1149 (9th Cir. 2001). This argument misses the mark, though, because the ALJ's specific and legitimate reason is not that the non-examining physicians disagree with Dr. Lax's opinion—it is that Dr. Lax's opinion is not supported by objective evidence. The latter is a specific and legitimate reason for rejecting Dr. Lax's opinion. *See Burrell*, 775 F.3d at 1140 (stating that a treating physician's opinions may be rejected as unsupported by objective medical evidence).

Duvall also argues that it was error to discount the opinion based upon it being rendered after the date last insured. She might be correct if this were the ALJ's sole reason, but it was not. The ALJ's rejection of the opinion on an additional substantive ground, i.e., lack of objective medical support, renders any such error harmless. *See Batson*, 359 F.3d at 1195 ("[A]n ALJ may discredit treating physicians' opinions that are . . . unsupported

by the record as a whole, or by objective medical findings." (internal citations omitted)).

Duvall's claims of error are without merit. Accordingly,

**IT IS ORDERED** that the decision of the Commissioner of Social Security is **affirmed**. The Clerk of Court is directed to enter judgment accordingly and close this case.

Dated this 23rd day of September, 2019.

_____
Maria Davila
United States Magistrate Judge